1  David A. Rosenfeld (058163)
   WEINBERG, ROGER & ROSENFELD
2  A Professional Corporation
   1001 Marina Village Parkway, Suite 200
3  Alameda, California 94501-1091
   Telephone 510.337.1001
4  Fax 510.337.1023

**ORIGINAL
FILED**

JUL 2 7 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

5

6  Attorneys for Petitioner
   United food and Commercial Workers, Local 5

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11  UNITED FOOD AND COMMERCIAL          )  No. **C 07 3871**
    WORKERS, LOCAL 5, as the Successor to )
12  UFCW LOCAL 1096,                     )  PETITION TO COMPEL
                                         )  ARBITRATION
13               Petitioner,             )
                                         )
14        v.                             )
                                         )
15  ACS, LLC,                            )
                                         )
16               Respondent.             )
                                         )
17  _____  )

18        This a Petition of Petitioner, respectfully shows:

19        1.     Jurisdiction of this Court is based upon 29 U.S.C. § 185, 9 U.S.C. § 4 and 28 U.S.C.

20  § 1337.   This is a Petition to Compel Arbitration of three labor disputes arising under the terms of

21  a Collective Bargaining Agreement between the parties.

22        2.     Petitioner is a labor organization within the meaning of 29 U.S.C. § 152.

23  Petitioner United Food and Commercial Workers Union, Local 5 is a successor to United Food and

24  Commercial Workers Union, Local 1096 which merged with five other Locals to form UFCW

25  Local 5, effective January 1, 2007.   It does business within this judicial district and has its

26  principal office in San Jose, California.   It is a labor organization organized for the purpose of

27  representing its members in their terms and conditions of employment.

28        3.     Respondent ACS, LLC is an employer whose principal place of business is in

WEINBERG, ROGER &
FELD
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510 337 1001

PETITION TO COMPEL ARBITRATION

1  Yuma, Arizona.    It is engaged in industry affecting commerce within the meaning of 29 U.S.C. §

2  185.

3      4.    A Collective Bargaining Agreement between Petitioner and Respondent existed for

4  the period November 20, 2002 through May 1, 2006.    That agreement provides for grievance and

5  arbitration procedures in Article IV and V, a copy of which is attached as Exhibit "A."

6      5.    In or about January, 2003, grievances arose between Local 1096 and ACS, known

7  as the Michelle Almaguere and Notice to ACS Employees grievances.    Those grievances have

8  been processed through the grievance procedure and the employer has in the past assured the union

9  that it would arbitrate those grievances.

10     Notwithstanding the above assurances that the Respondent would arbitrate those

11 grievances, the Respondent has now refused and declined to arbitrate those grievances.

12     6.    In 2003 a dispute arose between Petitioner, UFCW Local 1096 and the Respondent,

13 identified as the "True leaf" or "expansion of operation" grievance.    That matter was eventually

14 heard by Arbitrator Len Rutherford in September 14, 2004, who issued his decision on November

15 11, 2004.    A copy of that Decision is attached as Exhibit B.

16     Thereafter, the parties have not been able to resolve the rates and working conditions as

17 required by the Arbitrator.    The Petitioner has sought to arbitrate this dispute but the Respondent

18 has failed and refused to arbitrate the dispute which remains as identified by the Arbitrator in

19 paragraph 2 of the Decision.

20     8.    The above disputes are plainly arbitrable.    The case of the True Leaf grievances

21 involves rendering a complete decision in light of the Decision of Arbitrator Rutherford.    With

22 respect to the "Michelle Alamaguer" and "Notice to Employees" grievances, the employer had

23 previously agreed to arbitrate this disputes, but now has refused to comply with that commitment.

24 These are plainly disputes which are arbitrable under Article V of the agreement, since the

25 employer had agreed to arbitrate them, or had arbitrated them in the True Leaf case.

26     16.    The above failure and refusal of Respondent to arbitrate these grievances is a clear

27 violation of its statutory duty to arbitrate. There is no justification whatsoever for the Respondent's

28 refusal to arbitrate.    Respondent's refusal to arbitrate is without any justification.    Such refusal is

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510 337-1001

- 2 -

PETITION TO COMPEL ARBITRATION

1  disruptive to labor relations.    As such, the Employer has acted in bad faith, and an award of

2  attorneys' fees is appropriate if not compelled.    <u>United Food & Commercial Workers Union v.</u>

3  <u>Alpha Beta Co.</u>, 736 F.2d 1371, 1383 (9th Cir. 1983) and <u>International Union of Petroleum and</u>

4  <u>Industrial Workers v. Western Industrial Maintenance, Inc.</u>, 707 F.2d 425 (9th Cir. 1983).

5          WHEREFORE the Petitioner prays that this Court issue an order compelling the

6  Respondent ASC, LLC to arbitrate the dispute concerning Michelle Almaguer and Notice to

7  Employees as well as to submit to arbitration for the remaining dispute arising out of the

8  Arbitration Award of Len Rutherford.    Petitioner furthermore requests that this Court award

9  attorneys' fees for the totally unjustified refusal of ACS, LLC to arbitrate these grievances.

10  Petitioner furthermore requests such other relief as to this Court seems just and proper.

11

12  Dated: July 25, 2007

                                WEINBERG, ROGER & ROSENFELD
                                A Professional Corporation

13

14                              By: _____
                                    David A. Rosenfeld
15  1/463571                         Attorneys for Petitioner

16

17

18

19

20

21

22

23

24

25

26

27

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510.337.1001

- 3 -

PETITION TO COMPEL ARBITRATION

# EXHIBIT A

*2002-2006*

*COLLECTIVE BARGAINING AGREEMENT*

*BETWEEN*

*ACS, LLC*

*&*

*FRESH FRUIT & VEGETABLE WORKERS*

*UFCW LOCAL 1096*

# AGREEMENT

THIS AGREEMENT Made and entered into this 20th day of November 2002, by and between ACS, LLC. an Arizona entity, its successors and assigns (hereinafter called the "Company"), and FRESH FRUIT AND VEGETABLE WORKERS, UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL NO. 1096, AFL-CIO-CLC, its successors and assigns (hereinafter called the "Union")

## ARTICLE I - RECOGNITION

1.    <u>Independence of Negotiations</u>.  The Company and Union agree that this contract is a separate contract between the parties hereto and that ACS, LLC. is not a member of any multi-employer negotiating group. The parties hereto further agree that negotiations and interpretations in respect of this contract shall be independent from any multi-employer or industry-wide negotiation the Union might undertake with other entities. The parties further agree that only employees of the Company may vote on this contract and matters relating hereto.

2.    <u>Scope of Union Recognition</u>.    The Company recognizes the Union as the sole and exclusive bargaining agent for all of its plant production employees engaged in the handling of commodities (excluding watermelon and broccoli icing) at its vacuum cooling plant in Yuma, Arizona at 4102 S. Ave 3 ½ E. In the event the Company opens another plant in another state, the Company agrees to recognize the Union as the bargaining agent of the employees of such plant and extend the terms and conditions of this Agreement upon a showing by the Union that it represents a majority of the employees at the Plant.

1

There shall not be included and the terms of this contract do not extend to office clerical personnel or supervisory employees as defined and interpreted under the Labor-Management Relations Act, as amended. Nor shall it extend to maintenance personnel or the office manager on each shift. All dispatching personnel, other than the office manager, are included in the bargaining unit.

3.    <u>Effect of Expansion of Operations</u>.    In the event any new operation shall be installed the Company shall have the right to temporarily set the wage scale and working conditions but shall notify the Union of such new operation, and within ten (10) days thereafter the Union and the Company shall agree upon the wage scale and working conditions.

## ARTICLE II - UNION SECURITY

1.    The provisions of this Article shall have no application to the operations of the Company, if any, in the State of Arizona, and are hereby deleted as to such operations so long as they are contrary to the law of Arizona. The Union asserts that the amendment to the Constitution of the State of Arizona commonly referred to, as the "Right to Work Bill", and its implementing legislation, are unconstitutional and invalid and specifically reserves the right to secure a judicial determination thereon. Should they be repealed or held invalid by the Court of last resort, the provisions of this Section shall be eliminated and the provisions of this Article shall thereupon become effective as to operations in Arizona except as same may be modified or superseded by any Act of Congress or any lawful statute of the State of Arizona.

2.    Employees shall become members of the Union within thirty (30) day from the date of their employment, or within thirty (30) days of the execution of the Agreement, whichever shall occur later. Membership in good

2

standing in the Union shall be a continuing condition of employment for all employees covered by this Agreement, subject to the provisions and limitations of the Labor-Management Act.

3.    In event any employee shall fail to tender periodic dues or initiation fees, the Union shall give notice, in writing, to the Company requesting the discharge of such employee. The Company shall notify the employee of the receipt of such letter, and if the employee shall not tender his dues or initiation fees within twenty-four (24) hours after service of notice on the employer, the employer shall be required to discharge the employee. Such discharged employee shall not be re-employed until the Company has been notified in writing by the Union that the discharged employee has become a member in good standing in the Union.

4.    Company will, within fifteen (15) days after it commences operation in any season, give to the Union a list of all employees covered by this Agreement. Company will, to the extent possible, give this first list to the Union without written request by the Union, but the failure to do so shall not be considered a breach of this Agreement. Within ten (10) days after the start of each month thereafter, Company will, upon written request by the Union, give to the Union a list of all employees who are at that time covered by the Agreement. This provision will not apply in Arizona so long as the right to work law is in effect in that State.

5.    The Company agrees that it will not in any way discriminate against any employee because of his membership in, activity on or in behalf of, or sympathy toward the Union herein. Neither the Union nor the Company will discriminate against an applicant or employee because of race, creed, color, sex, age, national origin or religious belief.

## ARTICLE III - REPRESENTATION

1.     Company agrees to admit to its plants covered by the Agreement, at any Reasonable time, any authorized Union representative for the purpose of Conducting Union business; provided, however, there shall be no interference or Interruption of working operations. The Union representative shall notify the foreman or superintendent of his presence on the job before conducting any Union business.    The Union shall notify the Company at the beginning of each season of each authorized representative.

2.     Not more than two (2) shop stewards shall be selected by the Union at each plant. Except that where separate crews are employed ( day and night crews) there shall be not more than one (1) shop stewards for each crew, one of whom shall be designated as the Chief Steward. The shop stewards so selected shall represent the employees on the plant as provided in Article IV, Grievance Procedure. The Chief Shop Steward or the other shop steward in his or her absence shall handle all matters directly with the Company, in writing, the identity of the shop stewards and any changes thereof.

## ARTICLE IV - GRIEVANCE PROCEDURE

1.     Whenever any dispute or grievance shall arise between the Union and the Company or an employee and the Company, which cannot be settled informally, it shall be adjusted as follows:

**STEP ONE:**   The employee shall reduce the matter to writing or Union representative on forms provided by the Company and shall include the following:

　　　　　a.     A complete statement of the grievance and the facts upon which it is based;

4

    b.     The remedy or correction which it is desired the Company make; And

    c.     The section or sections of this Agreement relied upon or claimed to have been violated.

This written grievance shall then be presented by the Shop Steward or business agent of the Union to the foreman or Company representative. If the foreman or Company representative and the shop steward or business agent cannot settle the matter, the Company shall, within forty-eight (48) hours after demand by the business agent, furnish the Union with a written answer which shall include the following:

    a.     A complete statement of the Company's position and the facts upon which it is based; and

    b.     The remedy or correction offered, if any.

**STEP TWO:** If it is decided to appeal the grievance to STEP TWO, the business agent shall, within three (3) days after receipt of the Company's answer, send a notice of appeal, in writing, to the Company, which notice shall include the following:

    a.     A brief statement of the reasons for appeal;

    b.     Any additional facts in support of the original statement;

    c.     A statement of the remedy or correction requested from the Company; and

    d.     The section or sections of this Agreement relied upon or claimed to have been violated.

After such notice of appeal, the Union and Company shall arrange a conference, at which conference, either party may offer and present evidence of the grievance and during which conference a bona fide effort in good faith will be made by both of the parties to settle the grievance. Either party will

have the right to demand that said conference be had within five (5) days of the notice of appeal.

2.    Other provisions relating to grievances are:

(a)    The Company may submit a grievance in writing, directly to the Union and the same will be heard at a conference between the Union and the Company in accordance with the provisions of STEP TWO set forth above.

(b)    This provision shall not limit the right of any employee to present a grievance individually as provided under the Labor-Management Act; provided, however, the Union shall have the right to have its representatives present at such hearing and shall be notified of any such hearing.

(c)    Any of the periods within which any of the acts required in this Article are to be performed may be extended by written mutual consent of the Union and the Company.

(d)    If any employee is discharged, he shall be given the opportunity to present his grievance to his shop steward before leaving Company property.

(e)    Any grievance relating to discharge or to seniority shall be presented in writing within five (5) days (excluding Saturday and Sunday) after the discharge or the denial of seniority status, or such grievance shall be deemed to be waived. Any other grievance shall be presented in writing within thirty (30) days after the termination of the season in which the grievance occurred, or such grievance shall be deemed to be waived. Claims for loss of wages shall be limited to thirty (30) days previous to the date of filing grievance.

(f)    The Company agrees that the authorized Union representative designated in this Agreement shall not be hindered, coerced, restricted or interfered with in the performance of his duties of investigating, presenting, and adjusting grievances as provided for in this Article.

3.    If the grievance is not resolved at the conference as provided for In STEP TWO above, then either party may request, in writing, within fifteen (15) days of the conference that the matter proceed in accordance with ARTICLE V.  Failure of either party to give such written notice shall waive the rights to proceed in accordance with ARTICLE V.

## ARTICLE V – ARBITRATION

1.    Disputes concerning contract interpretation, the disposition of assets, the right of sale, the right to control the number of hours that the plant be open or closed down either for lack of business or for economic reasons, or matters which involve management decision or business judgment shall not be subject to arbitration.  Procedural questions of compliance with the contract shall be subject to judicial determination and not arbitration.  Either party may seek    judicial    relief    with    regard    to    any    of    the    foregoing.

Any other disputes concerning working conditions, safety or other matters not excluded herein, shall be subject to arbitration; provided a written notice has been given as provided in ARTICLE IV, Section 3 above.  The Company and the Union shall attempt by mutual agreement to appoint an arbitrator, then either party may request a panel of arbitrators to be submitted by the Federal Mediation and Conciliation Service, State Conciliation Service or American Arbitration Association, and an arbitrator shall be selected from such panel by the process of each party alternately eliminating one of the suggested names until there remains only one name on the panel.  Any such panel shall contain

at least seven (7) names of arbitrators. The parties shall complete the appointment of the arbitrator within five (5) working days of receipt of the list.

2.     At the outset of the arbitration hearing, the party appealing to arbitration shall furnish the arbitrator with copies of all documents relating to the grievance. The arbitrator and the parties shall then determine the issue to be arbitrated from the documents so offered and the arbitrator shall confine his decision to the issue or issues agreed upon. If the parties cannot agree upon the issue, the arbitrator shall determine the issue from the documents submitted.

3.     Either party may call such witnesses as are necessary and the arbitrator shall proceed to hear the matter and render a written opinion, which shall be final and binding, upon the parties hereto.

4.     Costs of arbitration shall be borne equally by the parties.

## ARTICLE VI - SENIORITY

1.     Seniority shall be obtained after sixty (60) days of satisfactory employment performance within a consecutive ninety (90) day's calendar period. Seniority shall commence with the date of hire, or the commencement of the first day of employment within the ninety (90) calendar-day periods herein referred to.  The Company shall post the seniority list on the bulletin board and mail a copy to the Union. Dispatcher selection and designation shall be solely at the discretion of the Company

2.     As to employees having seniority as heretofore provided, hiring and layoffs of such employees shall be on the basis of length of plant seniority and the demonstrated ability to perform the job required.

3.    To protect his seniority, an employee shall furnish the employer with his proper mailing address. The employer, by ordinary mail, shall approximately ten (10) days prior to the opening of the annual processing season, notify the employee of the approximate starting time thereof. Thereafter, it shall be the duty of the employee to keep himself informed of the actual starting date of his employment and to report on the date set therefor. The notice to report shall be given to him at least twenty-four (24) hours prior thereto by posting on the Company bulletin board or personnel roster board.

4.    Nothing in this section shall be interpreted to deprive an employee of his seniority status because he arrives later than the date of reporting; provided he arrives with-in either of the following:  (1) ten  (10) working days from the date the plant commenced operation; or (2) five working days from the date the individual's seniority entitled him to commence work after the plant commenced operation. The grace periods provided herein are only on the condition that his failure to arrive on time was because of his employment in a plant under this same form of agreement in another district where he has seniority or would have at the end of the season, and brings a certificate from his employer stating he was so employed and his services were required. He must report within three (3) days after ending such employment. It is also understood that Company shall provide such certificate when required to protect the seniority in another area. This paragraph shall not apply when season for the plant to which the employee is moving is customarily six (6) weeks or less. Any seniority employee who desires to exercise his right to report for work after commencement of operations at a plant as provided in this section shall notify the Company prior to its commencement of operations. Failure to so notify the Company shall waive the employee's right to late report for work as herein provided.

5.    Whatever seniority an employee has is lost when he:

    a.    is discharged for just cause; or

    b.    voluntarily leaves the employment of the employer without written leave of absence; or

    c.    fails to give notice and report as required under this Article; or

    d.    hires or attempts to hire another person (not an employee of the Company) to perform the job duties of such employee.

## ARTICLE VII - LEAVES OF ABSENCE

1.    Leaves of absence not to exceed two (2) months without pay may be granted by applying to and receiving approval from the Company. Leaves of absence may be extended by applying to and receiving approval from the Company, upon a satisfactory showing of necessity.

2.    Leaves of absence not in excess of six (6) days may be either in writing or oral at the option of the Company. All leaves of absence in excess of six (6) days must be In writing on forms, furnished by the Company and signed by the shop steward or other Union representative, the Company representative and the employee requesting such leave, in triplicate, one copy for the employee, one for the Union, and one for the Company.

3.    Leaves of absence shall not be granted for employees to work elsewhere or to venture into business.

4.    Leaves of absence shall be granted or extended upon illness of an employee substantiated by a doctor's certificate or other adequate proof of illness. Leaves of absence in excess of one (1) year shall not be granted unless the employee applying for such leave of absence provides the Company and Union with adequate reasons, including medical evidence when necessary to verify a disability.  Any application for medical leave of absence in excess of one (1) year must be accompanied by medical evidence with a definite prognosis for recovery. Any employee who was granted a leave of absence in excess of one (1) year and returns to work may return to work in their former seniority.

5.    An employee's appointment or election to conduct Union business shall be deemed good and sufficient reason for obtaining a leave of absence. Such employee shall be given, upon written notice from the Union to the Company, a leave of absence not to exceed one (1) year, which shall be extended yearly thereafter on request provided the employees shall be continuously conducting Union business.  Not more than three (3) employees shall be given leaves of absence under this section from any one plant, unless authorized by the Company.

6.    Seniority shall accumulate during leaves of absence, and upon his return within the period of the leave of absence; the employee shall be reinstated without loss of seniority and at the existing scale of wages.

## ARTICLE VIII - MEN and WOMEN IN ARMED FORCES

Employees who have been in the armed forces shall be entitled to return to their former positions or a position of like seniority, status, and pay. Seniority shall be subject and subordinate to the provisions of the applicable Federal and State law. Application for such reemployment shall be made within six (6) months of discharge or within such longer period as good cause may warrant. In all other respects, such re-employment shall be subject and subordinate to and in accordance with applicable Federal and State laws above referred to.

## ARTICLE IX - NO STRIKE, NO LOCKOUT

1.     The Union agrees that during the life of this Agreement, there shall be no strikes, slow-downs, or other interruptions of work.

2.     The Company agrees that there will be no lock-out during the life of this Agreement.

3.     It is understood that all disputes and grievances hereunder shall be settled under the Grievance Procedure sot forth herein.

4.     A strike or lockout during the term of this Agreement shall be deemed a breach thereof and either party may seek such legal relief as may be available to it without first invoking the grievance or arbitration procedure herein set forth.

5.    An employee's refusal to cross or work behind a legitimate, bona fide, primary picket line sanctioned by the International Office of United Food & Commercial Workers, AFL-CIO-CLC, shall not be deemed a violation of this Agreement. The Union shall not command, order or direct employees to exercise their rights under the foregoing clause but shall have the right to advise employees whether the strike or picket line is sanctioned, as to the facts of the particular labor dispute, and as to the employee's rights under the foregoing clause.    Neither shall the employer command, order nor direct employees to refuse to exercise their rights under the foregoing clause.    Each individual employee shall have the right to make his free choice to cross, or not to cross, any sanctioned picket line as defined above.

## ARTICLE X - RIGHT OF MANAGEMENT

1.    The Company shall have the right to direct the working force, to direct the accomplishment of any work of the plant.

2.    Employees shall comply with all lawful rules and orders including the Company's "Work Rules Policy", and "Alcohol and Substance Abuse Policy", not inconsistent with this Agreement , and agree to work for the Company in the capacity retained.

3. Company shall have the right to discharge any employee for reasonable cause. Persons using or having their ability affected by the use of alcohol or drugs during working hours shall be immediately discharged.

4.    An employee's refusal to cross or work behind a legitimate, bona fide, primary picket line sanctioned by the International Office of United Food and Commercial Workers, AFL-CIO and CLC, shall not constitute reasonable cause for discharge under this Article. The Union shall not command, order or direct employees to exercise their rights under this clause

13

but shall have the right to advise employees whether the strike or picket line is sanctioned as to the facts of the particular labor dispute, and as to the employee's rights under this clause. Neither shall the employer command, order nor direct employees to refuse to exercise their rights under the foregoing clause. Each individual employee shall have the right to make his free choice to cross or not to cross any sanctioned picket line as defined above.

## ARTICLE XI – SAFETY

1.     The Company shall abide by any and all Federal, State or local laws or regulations relative to sanitation and health in the maintenance and operation of its plants. The Company shall maintain the equipment in good working condition.     Failure to comply with any such law, ordinance, regulation, or maintenance of equipment shall not be deemed a breach of this contract until the same has been called to the attention of the Company and such breach has not been remedied within a reasonable time thereafter.

2.     No employee shall be required to work where hazardous or unsafe conditions prevail.

3.     The Company and the Union shall abide by all food safety rules required by the Company or its customers.

## ARTICLE XII - WORKING CONDITIONS

1.     There shall be a time piece placed in a conspicuous place on each plant.

14

2.      The Company shall make available for the Union's use a bulletin board on each plant. Said bulletin board shall be used by the Union exclusively for the purpose of posting notices of official Union business.

3.      The Company shall make readily available to the employees each day or show on time cards, the number of hours worked and the number of packages handled.

4.      The Company will inform orally or by posting on the bulletin board each night the work time or the time when employees should phone in the next day to be given their work time, which shall not be sooner than one (1) hour after the posted phone-in time. When the employee phones in as herein provided, the Company shall, if possible, tell the employee whether or not the employee will work that day. The employee may be required to call back not more than three (3) times to receive the actual time to report to work. At busy times the Company may hire temporary experienced persons (boosters) to assist in periods of heavy volume or employee absence and permit said persons to share pro-rata in the piece rate.

5.      Employees whose work is such that it has been the custom to necessitate the use of special equipment shall be furnished with such equipment, free or charge, and it shall be returned to the Company at the termination of employment, in good condition, reasonable wear and tear accepted.

6.      The Union shall hold its members to satisfactory performance of their duties as set forth by the Company. Employees who are responsible for the loading function of produce in carriers for transportation to market shall be responsible for the correct count of the number of containers loaded.

7.    In order to provide two (2) consecutive hours for employees to vote on State and Federal election days, the Company shall call its crew at 9:00 a.m., or anytime thereafter, or shall release its crew between the hours of 5:00 a. m. and 7:00 p.m.

8.    There shall be no split shifts.

9.    The Company shall not change a time card; manifest sheet or other record of employment without reasonable notice to the employee.

10.    Within seven (7) days of a new hire, other than temporary (booster) help, the Company shall notify the Union of the name, address and social security number of said person.

11. The Company will post signs to make driving areas off limits to unauthorized persons from visiting the plant.

12.    The Company shall provide each employee with a written memorandum each week indicating the computation of such employee's compensation. A time card providing such information may be used for this purpose.


## ARTICLE XIII - HOURS AND OVERTIME

1.    The hours and overtime of work in excess of forty (40) straight-time hours in any work week shall be paid at the overtime rate. The overtime rate shall be one and one-half (1-1/2) times the straight-time rate.

2.    Scheduling. The Company shall determine work schedules and assign days off.

16

## ARTICLE XIV - PLANT OPERATIONS

1.     All work at the plant shall be accomplished by a total group work force, all of which shall cooperate together to accomplish and perform the work necessary for the proper and careful handling of all the products at the plant. It is recognized and understood between the Company and employees that the work must be accomplished to the satisfaction of the customers at such plant. The employees shall perform any demands by the said customers not unreasonable on their face. Any changes necessitated by customers' demands for changes in the handling of their product or changes in the operating practices of the plant shall be discussed by the Company and its employees at their request, and if reasonable, in light of the customers' business, shall be put into effect. The duties of each employee and the grouping as a whole shall include, but not be limited to, the following:

a.     Receive from the field trucks, trailers or other methods of conveyance, the products incoming into the plant, place in location prior to cooling, cool the product and load it as designated by the customers' orders.

b.     Maintain a complete and accurate account of all products received and shipped and not permit any loss to the customers' produce, either by failure to keep accurate count, or negligent handling of the product or pilferage. After cooling all of the customers' products, it shall be placed in the cold room and kept under cold storage at all times, except when necessary for loading or when cold room space is not available. Products shall be rotated daily and shipped pursuant to customer's directions.

c.     Keep the premises neat and clean and free of dirt, gravel or debris in all working areas and perform such other duties that are incidental to the accomplishment of this result.

## ARTICLE XV - SALARY SCALE

1.    HOURLY RATE:

Each employee shall be paid at the rate of Twelve (12) Dollars per hour, together with the overtime accumulation at one and one half (1.5) times the regular rate after forty (40) hours per week.

2.    ALTERNATIVE INCENTIVE BONUS:

Alternatively, each employee shall receive an incentive bonus equal to the total number of cartons manifested from the plant multiplied by the following rates: $.1103 cents per carton for each carton of vegetables cooled and loaded at this plant, $.0848 for any non-cooled product other than green onions, strawberries and mixed berries loaded through this plant. Green onions will be paid at the rate of $.0689 and strawberries at the rate of $.03922 and mixed berries at the rate of $.02226. Pallet Reloads will be paid to the crew as follows: The first four (4) pallets requested moved will be free. If more than four (4) pallets all pallets will be paid to the crew at the rate of $3.18 per pallet, less the total regular pay and divided by the number of employees working at the plant, and such division shall be made on a daily basis. For the purpose of this calculation, each employee shall be deemed to have worked an equal number of hours in each work week and shall receive an equal rate of pay with all other employees based on actual days worked. The total number of hours deemed to be worked by each employee shall be the highest number of hours accumulated by an employee subject to this division at straight time with overtime accumulations. The employees shall, at their own volition, or if not by their own volition, then by direction of the Company, balance the number of hours worked for the entire season so that each employee shall have worked an equal amount of hours of overtime and straight time for the entire season.

Heretofore the group entitled to share in the piece rate has been limited to three (3) dispatchers. Hereafter the number of dispatchers entitled to share in the piece rate shall be four (4). The Company will not reduce the piece rate employees total seasonal earnings (x1.06) based upon the 2001-2002 volume and wages by the additional dispatcher provided above. Any further additions (past four) to the clerical function of the dispatch office shall be paid by the company at a rate of pay determined at the company's sole discretion. In no event will the additional clerical employees be paid from the crew piece rates, or be covered under this contract.

In the event that work is performed that does not result in the total number of functions per product contemplated by the parties, ( receiving from field trucks, pallet tagging, vacuum cooling, transport to the cold room, arranging in cold room loading per customer order, counting and certifying the amount loaded and any other alternative duties associated therewith), the rate to be determined shall take into account these factors as they relate to the total time required.

## ARTICLE XVI - LIFE, HEALTH AND WELFARE

The Company shall contribute to a health plan selected by the employees. The Company's contribution hereunder shall not exceed $250.00 per month. In the event that the plan rate is higher per month, the Company shall contribute the sum of $250.00 per month and the remaining cost shall be borne by the employee.

19

The Company shall make available benefits under Western Growers Assurance Trust Plan 841 -- Cooler Workers, (or a comparable plan selected by the Union  described on the attached plan description.

Western Growers Assurance Trust, through the Company, shall also make available to all employees that are covered by the above insurance plan when working the option to continue the same coverage beginning with the first month of lay-off, or the first month he has no coverage. There cannot be any lapse in the coverage. He then shall pay the insurance company the amount of premium and must continue with the self-pay plan until his return to work. There are absolutely no exceptions to the above in regard to the self-pay plan. plan.

## ARTICLE XVII - PENSION

The Company shall maintain in effect during the term of this Agreement an individual retirement account pension plan to which the Company shall contribute the sum of One Dollar ($1.00) per hour for each hour worked.

## ARTICLE XVIII - CHECK OFF OF
## UNION DUES AND INITIATION FEES

1.    When executed voluntarily by an employee, the Company shall honor wage assignments authorizing the withholding by the Company from

such employee's pay of the regular initiation fees and periodic dues paid by members of the "Union".

2.      Such wage assignment shall be revocable by the employee upon thirty (30) days written notice to the Company and the Union. Payroll deductions shall be made from the next paycheck following submission of the wage assignment by the business agent to the Company at its main office and from the first pay period in month thereafter. If the employee is discharged or quits prior to his regular payday, deductions are to be made when that employee receives his final check.

3.      The employer will make out a check covering the total amount of dues and initiation fees deducted, together with a list of employees from whom the dues and initiation fees were deducted, and the amount deducted from each employee.

## ARTICLE XIX – SUCCESSOR

This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns. In the event of a sale, lease, or other transfer of all or substantially all of the assets of the business and ownership of the Company, the Company shall require as a condition of such transaction that the transferee be bound by the terms and conditions of this Agreement. The transfer of equipment for use at another plant shall not be subject to this provision.

Compliance with this provision relieves the transferor from any further legal or contractual obligations in connection with the sale, lease or transfer and the Union waives any further rights to bargain over effects of such sale, lease or transfer.

## ARTICLE XX  - PREPARATION OF AGREEMENT

This Agreement shall be construed without regard to the party or parties responsible for the preparation of the same, and shall be deemed to have been prepared jointly by the parties hereto; any ambiguity or uncertainty that may exist herein shall not be interpreted against either party, but according to the application of other rules of contract interpretation.

## ARTICLE XXI - DURATION OF AGREEMENT

This Agreement shall become effective November 20, 2002 and remain in force until MAY 1, 2006.

UNION:

      FRESH FRUIT & VEGETABLE WORKERS,

      LOCAL NO. 1096

      314 RIANDA STREET

      SALINAS, CALIF.   93915

EMPLOYER:

      ACS, LLC.

      4102 S. AVE 3 ½ E.

      YUMA, ARIZONA  85365

IN WITNESS WHEREOF, the parties have duly executed

This Agreement this __ day of _____, 2002

UNITED FOOD & COMMERCIAL

WORKERS UNION LOCAL NO. 1036,

AFL - CIO-CLC

BY _____

ACS, LLC.

By _____

23

# *ACS, LLC*

# *SUBSTANCE & ALCOHOL ABUSE*

# *POLICIES AND PROCEDURES*

# ACS, LLC DRUG PROGRAM

I.    PURPOSE

As part of its commitment to safeguard the health of its employees, to provide a safe workplace, and to promote a drug-free community, ACS, LLC (hereinafter "the Company") establishes this policy on the use and abuse of alcohol and illegal drugs by its employees. Substance abuse, while at work or otherwise, seriously endangers the safety of employees, as well as the general public, and creates a variety of workplace problems, including increased injuries on the job, increased absenteeism, increased health care benefit costs, increased theft, decreased morale, decreased productivity, and a decline of quality of the service provided by the company. The Company has established this policy to detect users and remove abusers of alcohol and illegal drugs form the workplace. It is also the policy of the Company to prevent the use and/ or presence of those substances in the workplace in accordance with the following guidelines.

The purpose of this policy is to communicate the Company's position on alcohol and drugs in the workplace and to provide guidance for the implementation of related programs within the Company.

II.    SCOPE

All Company employees, including management, administrative and temporary employees, are subject to the rules and disciplinary actions under this policy. As a condition of employment, employees are required to abide by the terms of this policy. This substance abuse policy governs in the area of alcohol and drugs.

Certain employees may be subject to additional requirements under state and/ or federal regulations.

III.    SUBSTANCE ABUSE POLICY DISSEMINATION

A.    All employees are to receive written notice of the Company's substance abuse policy. All existing employees will receive a copy of the Company's substance abuse policy, and new employees shall be required to sign an Acknowledgment of Receipt and Understanding before an offer of employment.

B.    All applicants shall be informed of the Company's policy of pre-employment testing and shall be required to sign an Applicant Drug Testing Consent Agreement prior to consideration of hire.

## IV.   DEFINITIONS

### A.   Illegal Drugs

"Illegal drugs" are drugs or controlled substances which are (1) not legally obtainable or (2) legally obtainable but not obtained or used in a lawful manner. Examples include, but are not limited to, cocaine and marijuana, as well as prescription drugs, which are not lawfully obtained or properly utilized. The term "illegal drugs" also includes mind-altering and/ or addictive substances, which are not manufactured for medicinal use but are used for mind or behavior-altering effect.

### B.   Legal Drugs

"Legal drugs" are those prescribed of over-the-counter drugs, which are legally obtained by the employee and used in accordance with the purpose for which they were prescribed and sold.

### C.   Sensitive Position

A "sensitive position" is any position, which requires the performance of physical or supervisory tasks directly affecting operations which, if performed improperly, could result in injury or death to employees or others or could result in significant property damage. A position will also be classified as sensitive if it requires responsibilities with a high degree of trust and confidence.

### D.   Company Property

The term "Company Property" includes work sites; parking lots; vehicles; or offices owned, rented, utilized, or serviced by the Company or by any members/vendors of the Company; or employee-owned or employee-rented vehicles on the property of the Company while on the Company business; and locations where the employees represent the Company in any capacity.

### E.   On Duty

The term "on duty" includes all working hours, as well as meal periods and break periods, regardless of whether on premises, and all hours when an employee represents the Company in any capacity.

## V.   DRUG USE PROHIBITIONS

### A.

The use, sale, purchase, possession, distribution, or dispensing of illegal drugs on Company property or during work time is against Company policy and is cause for immediate termination.

### B.

It is also against Company policy for any employee to report to work or to work with the presence of illegal drugs in the employee's body. Employees who violate this policy are subject to disciplinary action, up to and including termination.

C.   Legal drugs may also affect the safety of the employees or fellow employees or members of the public. Therefore, any employee who is taking any legal drug that might impair safety, performance, or any motor functions must advise his or her supervisor before reporting to work under such medication. Improper use of "legal drugs" is prohibited and will result in disciplinary action.

D.   Refusal to submit to, efforts to tamper with, or failure to pass a drug and/ or alcohol test will result in disciplinary action, up to and including termination, and/ or self referral to treatment at the employee's expense.

VI.   ALCOHOL USE PROHIBITIONS

A.   The consumption of alcohol on Company property or while on duty is prohibited and will result in disciplinary action, up to and including termination. There may be occasions, however, removed from the usual work setting, at which it is permissible to consume alcohol in moderation (e.g., Company picnics, receptions, civic activities, sporting events).

B.   It is against Company policy to report to work to work under the influence of alcohol.

C.   Employees may be asked to submit to an alcohol test based on reasonable suspicion that their ability to perform work safely or effectively may be impaired.

D.   Refusal to submit to, efforts to tamper with, or failure to pass an alcohol test will result in a disciplinary action, up to and including termination.

E.   If a supervisor believes that reasonable suspicion exists, the supervisor should report his or her findings and observations to the Company's General Manager immediately.

VII.   TESTING

A.   <u>Testing of Applicants</u>

1.   All applicants considered final candidates for a position would be subject to a screen for the presence of illegal drugs and alcohol as a part of the application process.

2   Applicants will be advised of the Company pre-employment testing requirements prior to an offer of hire.

3.   Any applicant who refuses to submit to, tamper with, or fails to pass the pre- employment drug or alcohol test shall be ineligible for hire.

B.    Reasonable Suspicion Testing

1.    Employees may be asked to submit to a drug or alcohol test based on a reasonable suspicion that their ability to perform work safely or effectively may be impaired. Factors that individually or in conjunction could result in reasonable suspicion include, but are not limited to, the following:

a.    Direct observation of an individual engaged in a drug related activity;

b.    A pattern of abnormal conduct;

c.    Unusual, irrational, or erratic behavior;

d.    Unexplained, increased or excessive absenteeism or tardiness;

e.    Sudden changes in work performance.

f.    Repeated failure to follow instructions or operating procedures;

g.    Violation of Company safety policies or failure to follow safe work practices;

h.    Unexplained or excessive negligence or carelessness;

i.    Discovery or presence of drugs or alcohol in an employee's possession or near an employee's workplace;

j.    Odor or residual odor peculiar to some drugs;

k.    Arrest or conviction for a drug-related crime;

l.    Information provided either by reliable and credible sources or independently corroborated; or

m.    Evidence that an employee has tampered with a prior drug test.

2.    If a supervisor believes reasonable suspicion exists, the supervisor should report his or her findings and observations to the Company's General manager immediately.

C.    Post-Accident Testing

Employees may be tested for the presence of drugs and/ or alcohol following an accident or other occurrence that involves one r more of the following covered events: a fatality, an injury to an employee or other individual, substantial damage to vehicles or other machinery, or other property.

D.    Follow-up Testing

Any employees who have participated in a substance counseling or rehabilitation program will be subject to unannounced follow-up tests for a two-year period after returning to work or completion of any rehabilitation program, whichever is later.

E.    Additional Testing

Additional testing may also be conducted as requires by applicable state or federal laws, rules, or regulations or deemed necessary by the Company. Upon initial implementation of this Substance Abuse Policy, all current employees will be subject to testing.

F.    Random Testing

1.    Employees will be required to submit to drug and/ or alcohol testing on a random basis.

2.    Selection of employees for random testing shall be conducted through the use of a random number generated or other neutral selection process.

G.    Testing Procedure

1.    The Company will determine for which drugs testing will be performed.

2.    If the employees refuses to consent to testing, fails to appear for testing, tampers with the test, or fails to cooperate with the testing procedures, he or she may be disciplined up to and including termination.

3.    A qualified laboratory selected by the Company will analyze test samples. All urine samples will be tested according to the following sequence:

a.    All urine will be subject to an initial screening process to detect the presence of illegal drugs and/ or alcohol;

b.    Those samples having a negative screening (no illegal or illicitly used substances present) will be considered to have tested negative, and no further testing will be performed on that sample; and

c.    Those samples that test positive n the first screen will be tested more extensively by means of Gas Chromatography/ Mass Spectrometry (GC/MS) to eliminate any false-positive tests and to confirm the presence of illegal drugs and/ or alcohol.

4.    An appropriate company official will inform employees who consent to testing of the results. As set forth within, a positive test will result in disciplinary action up to an including termination.

5.  Any employee who adulterates a specimen or who otherwise attempts to invalidate a test shall be subject to discipline up to an including termination.

6.  Employees who test positive may appeal the test result in accordance with the procedure listed herein.

H.  <u>Appeal of Confirmed Positive Test</u>

1.  After receipt of a report confirming a positive test result from the testing laboratory, the Company will inform an employee in writing of the position test result and the consequences of the positive test result.

2.  An employee may request and receive from the Company a copy of the test result report.

3.  Within one business day after receiving notice of a confirmed positive test result, the employee may submit written information to the Company designee explaining the positive test result and the reason(s) why the result does not constitute a violation of the Company's Substance Abuse Policy.

4.  The employee may request that a re-test performed by SAMHSA (Substance Abuse and Mental Health Services Administration) certified laboratory. The employee will be responsible for all costs associated with conducting the re-test.

VIII.  DISCIPLINARY ACTION

A.  In the case of a first-time violation of the Company's substance abuse policy, including a positive drug or alcohol test result (without evidence of use, sale, possession, distribution, dispensation, or purchase of drugs or alcohol on Company property or while on duty), the employee will be disciplined up to and including termination or the following will apply:

1.  The employee will be subject to discipline and referred to treatment (at the expense of the employee).

2.  The employee must contact and participate in rofessional drug and/ or alcohol evaluation, counseling, and/ or rehabilitation. The employee must cooperate with the Company designated staff member in carrying out his or her responsibilities in evaluating the follow-up process.

3.  Employees who (1) do not cooperate, (2) refuse to participate or do not satisfactorily complete a drug or alcohol abuse assistance or rehabilitation program or (3) violate any part of this policy will be terminated.

4. The employee may require impatient or outpatient treatment. If in-patient treatment is required, the Company reserves the rights to consider placing the employee on leave status without pay during his or her absence.

5. Any employee referred to treatment for drug use must sign a Last Chance Agreement prior to returning to work and agree to submit to unannounced drug testing for a period of up to two (2) years.

6. After signing the Last Chance Agreement, and before returning to work, the employee must submit to a drug and/ or alcohol test, and the results of the test must be negative.

B. The Company may suspend employees (with or without pay) under this policy pending the results of a drug/alcohol test or investigation.

## IX.  SUBSTANCE ABUSE TREATMENT

A. The Company regards its employees as its most valuable asset. No employee will be subject to discipline for voluntarily seeking substance abuse treatment. An employee, however, may not avoid discipline for violating the substance abuse policy by seeking this assistance after the employee, in accordance with this policy, has been randomly selected for the screening process.

B. Any performance, attendance, or behavioral problems may result in discipline up to and including termination, even if an employee is voluntarily participating in a substance abuse treatment program.

C. Employees referred to substance abuse treatment because of the Company's substance abuse policy may continue their employment with the approval of the Company, providing that:

1. They strictly adhere to all terms of treatment and counseling prescribed;

2. Immediately cease any and all use of alcohol and/ or drugs; and

3. Consent in writing to periodic unannounced testing for a period of up to two (2) years after returning to work or completion of any rehabilitation program, whichever is later.

D. In keeping with the Company's need for safety and security, the Company director will determine whether the Company should grant a leave of absence or reassign an employee following a positive test or during the period of evaluation, treatment, or counseling.

E.     Participation in any evaluation, treatment, or counseling program will be at the employee's expense unless the employee is entitled to such benefits under terms of the Company's group health plan or by other available benefits. Time lost from work for such a program shall be without pay.

## X.     INVESTIGATION

A.     To ensure that illegal drugs and alcohol do not enter or affect the workplace, the Company reserves the right to search all vehicles, containers, desks, file cabinets, or other items on Company property in furtherance of this policy. Individuals must display personal property for visual inspection upon Company request.

B.     Failure to consent to search or to display personal property for visual inspection will be just cause for termination or denial access to company premises.

C.     The Company will turn over all confiscated drugs to the proper authorities. Furthermore, the Company will cooperate with and may enlist the services of the proper authorities in the course of any investigation.

## XI.     ARREST OR CONVICTION FOR DRUG-RELATED CRIME

A.     If an employee is arrested for or convicted of a drug-related crime, the Company will investigate the circumstances, and Company officials may utilize the drug-testing procedure if reasonable suspicion exists as a result of the investigation. In most cases, an arrest for a drug-related crime constitutes suspicion under this policy.

B.     As a condition of employment, an employee shall notify the Company's manager of any drug statue violation, which occurred on or off Company premises. The employee must give notice in writing to the Company within three (3) days of such violation.

## XII.     COFIDENTIALITY

The results of an applicant or employee's test for the use of illegal drugs or alcohol shall be transmitted to the Company's General Manager. In order to effectively address the employees with drug or alcohol problems, it will be necessary for the manager to consent with other persons in the process. However, such results may be disseminated only on a need-to-know basis.

I _____ have read the ACS, LLC Drug & Alcohol Abuse Policy and agree to comply with the Company's Policy.


Date _____    Signature _____

# ACS. LLC

# WORK RULES

## ACS, LLC. WORK RULES

The orderly and efficient operation of the Company requires that employees maintain discipline and proper personal standards of conduct at all times. Work Rules are designed to protect the rights of the employee as well as the employer. Employees are expected to obey all established General Work Rules and to observe all proper standards of conduct. The following Work Rules have been established for the benefit and protection of the Company and all employees of ACS, LLC. The management of ACS, LLC regards violation of any of the General Work Rules as a very serious matter and utilizes progressive discipline (which may lead to discharge) as a matter of practice for most violations. However, violations of certain Work Rules will result in immediate discharge. The following Work Rule violations are serious offenses, which will result in immediate discharge.

1. Fighting, challenging to fight, using profane or derogatory language likely to provoke a fight, attempting to commit or committing bodily injury, threatening or intimidating:
    a. Other employees while on Company premises or at work.
    b. Management or supervisory personnel at any time.

2. Theft, fraud, or intentional destruction of Company property or equipment. Negligence or carelessness that results in injury or death to any individual on the Company premises.

3. Introduction, possession, or use on the job of illegal or habit forming drugs or intoxication liquors, or reporting to or working under the influence of drugs or intoxicating liquors.

3. Possession of weapons on Company premises or while working.

4. Gross insubordination or refusal to obey instructions or to perform work as assigned.

5. Violations of applicable Local, State or Federal laws on Company premises or during work hours. For purposes of this section, an arrest, or conviction is not necessary to establish violation.

6. Soliciting money for performing any job function or receipt of money for any work performed from anyone other than the Company. Offering or receiving money, gifts or other valuable considerations in exchange for personal gain, a job, better working place or change in working conditions.

Any employee who commits any of the following offenses is subject to progressive disciplinary action.

1. Five (5) days of unexcused absences in on season.

2. Restricting personal work output or the output of other employees, singly or in agreement or cooperation with others.

3. Using Company equipment or property for purposes other than Company business without prior written authorization.

4. Unexcused or excessive tardiness.

5. Operating any mechanical equipment in any manner likely to cause damage, such as display of excessive motor RPM, rapid acceleration, sliding wheels, spinning wheels or any activity indicating lack of proper regard for the mechanical equipment.

6. Exhibiting an uncooperative or negative demenor towards any Company policy or person employed, including but limited to:
   a. Management
   b. Supervisory Personnel
   c. Customer Personnel
   d. Third parties carrying on their regular business with the Company.
   e. Company policy

GENERAL WORK RULES:

1. No employee shall punch in more than five (5) minutes before the scheduled work time without authorization.

2. Employee's punching in for work are to be READY to work. If you desire food, coffee, cigarettes, etc., please take care of these items before reporting to work.

3. Employee's are responsible for checking their call times. Call times will be posted in an obvious place near the time clock everyday.

4. Employee's are required to punch in and out and are responsible for punching their OWN TIME CARDS. In addition, if an employee leaves the plant site FOR ANY REASON, other than company business, the employee must punch out.

5. Any employee who incorrectly punches in or out should initial the card by the error and then have the foreman adjust and initial the error.

6. Employee's are restricted from using Company telephones without authorization or conducting personal business during working time or in working areas.

7. No employee shall remove produce from the property of ACS, LLC without the expressed permission of the General Manager.

8. Employees are to report to work in attire that is clean, neat and in good repair. Clothing and shoe selections must be practical and afford the wearer appropriate safety in performing assigned duties.

9. Accountable employees are required to sign all loading manifests, receiving tickets, holdover counts, sales orders check outs and bills of lading.

10. Loaders are responsible for pulling and counting their own pallet tags. Pallet tags must be for product loaded.

11. Loaders are prohibited from pulling tags from other product in order to satisfy or justify load counts.

12. All loading manifests will be filled out entirely by the loader that actually loads the truck. Once an order is started, that loader is responsible for that product and the completion of that manifest. Altering or attempting to alter information supplied regarding an order will be grounds for immediate termination.

13. Employee's acting as a receiver in any area of the plant must indicate all adjustments on field tickets and have the driver or delivery person initial the changes.

14. Racks will be used only for their assigned purposes. They are not to be used as load dividers or gates.

On this date_____ I was given a copy of the ACS, LLC Work Rules. I understand that it is my responsibility to read and follow these rules.

_____
     Employee Signature

# EXHIBIT B

**ARBITRATION HEARING**
**BETWEEN**
**UNITED FOOD AND COMMERCIAL WORKERS UNION**
**FRUIT & VEGETABLE WORKERS LOCAL UNION No. 1096**
**AND**
**ACS, LLC**

FW1096-1057790

| | | |
|---|---|---|
| UFCW Local 1096 | ) | **FMCS Case: 04-53814** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| ACS, LLC | ) | **DECISION AND AWARD** |

An arbitration hearing was held on September 14, 2004, at the office of Clark and Moore, 256 South Second Avenue, Yuma, Arizona for the resolution of the above-referenced matter. The arbitration hearing was established pursuant to the provisions of the Collective Bargaining Agreement between the United Food and Commercial Workers Union Fresh Fruit and Vegetable Workers Local Union No. 1096, hereinafter referred to as "Union", and ACS, LLC, hereinafter to as "Company", dated November 20, 2002 through May 1, 2006. Following unsuccessful attempts at resolving the grievance, it was referred to arbitration in accordance with Article IV of the Collective Bargaining Agreement. Using the services of the Federal Mediation and Conciliation Services, Len Rutherford was appointed as Arbitrator. In attendance were A. James Clark, Esq., Lead Counsel and Theresa Legere, Esq., Associate Counsel for the Company; John B. Smith, Chief Operating Officer of ACS; Shirley Lee, Esq., Counsel for the Union, Pete Maturino, Union Representative, UFCW 1096; and Len Rutherford, Arbitrator. The parties agreed that the Arbitrator could determine the issues to be resolved in the arbitration based on the evidence and arguments presented. Both the Union and the Company submitted post-hearing briefs.

1

# GRIEVANCE SUMMARY

The grievance is based upon the assertion by the Union that the Company violated Article I, Section 3, "Effect of Expansion of Operations", and Article XV, Section 2, "Alternative Incentive Bonus", by unilaterally implementing a different incentive bonus rate pertaining to Employer, True leaf Products.

# ISSUES

The issues were determined to be: (1) Did the Company violate the Collective Bargaining Agreement by unilaterally implementing a rate of Alternative Incentive Bonus outside the negotiated rate, (2) Did the Company fail to notify the Union within the specified time period after the new rate was implemented, and (3) If so, the appropriate remedy.

# EVIDENCE PRESENTED

ACS, LLC is a Company that cools and loads pallets of vegetables to be shipped on trucks. There are two (2) broad functions of products: Cool and Load Products, and Load Only Products. The ACS plant was built to accommodate two (2) Companies: Duda Cooling and Fresh Kist, with Duda comprising approximately seventy percent (70%) of ACS' gross income.

During the course of the testimony, the subject of the event of True Leaf (a.k.a. Leaf Tek products) as a customer was the main topic of argument between the parties.

**(Company Testimony)**

The Company testified that True Leaf was a new operation, while the Union's argument was that True Leaf was an expansion of operation. Article I, Section 3 of the Collective Bargaining Agreement states, *"Effect of Expansion of Operations". In the event any new operation shall be installed the Company shall have the right to temporarily set the wage scale and working conditions but shall notify the union of such new operations, and within ten (10) days thereafter the Union and the Company shall agree upon the wage scale and working conditions."*

It was stipulated that the loss of Duda Cooling at the end of the 2002-2003 season greatly reduced the amount of work within the Company, thus lowering the amount of Alternative Incentive Bonus available to the employees. The aforementioned bonus is calculated by the number of cartons manifested from the plant multiplied by a negotiated rate in Article XV, Section 2. That amount is pooled, and equally divided between the employees.

The Company testified that when True Leaf contemplated becoming a customer, True Leaf had reservations concerning the quality of receiving and dispatching being performed by ACS employees and required that True Leaf employees assume those tasks. Without this concession, Mr. Smith testified that True Leaf would not have become a customer. Mr. Smith testified that True Leaf product(s) weigh much less than the Fresh Kist products handled at the ACS plant. True Leaf knew that the Fresh Kist cartons of product weighed approximately fifty (50) pounds or more, and True Leaf's cartons weighed three (3) to four (4) pounds. True Leaf and ACS discussed the cost to True Leaf for ACS to perform some of the handling functions itself, and that Fresh Kist and Duda's products came in uniformly sized cartons, and True Leaf's Were sized much smaller and were varied. Both Fresh Kist and Duda product were sized to fit between 35 (thirty-five) and 49 (forty-nine) cartons to a pallet. ACS and True Leaf tried to

1    negotiate a price that would, not only pay the employees fairly, but also make it affordable for

2    True Leaf to utilize ACS employees for some functions.  True Leaf and ACS decided that a fair

3    price would be based on the industry standard of forty (40) cartons to a pallet.  Thus, True Leaf

4    and ACS based the True Leaf carton rates on the rate of forty (40) cartons per pallet, and based

5    the True Leaf carton rate for a standard pallet of $4.41 (40 X $0.1103).  To justify this, ACS

6    cited Article XV, last paragraph: *"In the event that work is performed that does not result in the

7    total number of functions per product contemplated by the parties, (receiving from field trucks,*

8    *pallet tagging, vacuum cooling, transport to the clod room, arranging in cold room loading per*

9    *customer order, counting and certifying the amount loaded and any other alternative duties*

10   *associated therewith), the rate to be determined shall take into account these factors as they*

11   *relate to the total time required".*  Mr. Smith also testified that at the rate of $0.1103, and based

12   on the size of True Leaf's cartons, which could be loaded at as many as 140 cartons per pallet,

13   the cost of the Alternative Incentive Bonus would be $15.40 per pallet.  True Leaf simply would

14   not pay that rate.  The Company notified the employees and the Union through the Shop

15   Steward by posting the True Leaf rates at ACS the first week True Leaf started operating at

16   ACS, even though the Company's position is that they had no obligation to notify the Union as

17   True Leaf is a new customer.

18          **The Company's position is as follows:**

19              1.    True Leaf was a new customer, and with the exit of Duda Cooling, this

20                      was ultimately a reduction of functions.

21              2.    ACS notified the Union by posting the rates at ACS, within the time

22                      limits as set forth by the Collective Bargaining Agreement.

23              3.    The rates set by ACS for True Leaf were within the perimeters of the

24                      language in Article XV.

25

4.   The Company did not refuse to negotiate the rate with the Union, as testimony showed that there were at least two (2) meetings before impasse forced Arbitration.

5.   ACS did not refuse to provide the information to the Union concerning carton numbers, as the employees received all this information on their pay stubs.

6.   The Union's claim that True Leaf itself caused the employees to lose wages should fail as real cause was a sharp downturn in the market and the loss of a huge customer.

**(Union Testimony)**

In the Union's opening statement, Ms. Lee testified that it is the Union's position that the only Alternative Incentive Bonus in the Collective Bargaining Agreement for the number of cartons manifested from the plant is $0.1103 cents per carton, and that the Company implemented at least twelve (12) additional rates based on the amount of cartons per pallet for True Leaf products. The Union met with the Company and proposed $0.1103 for the rate, but received no counter-proposal from the Company.

Mr. Maturino testified that the Company did not notify the Union when True Leaf became a customer of ACS, and the Company implemented the new rates. Adding the employees and products from True Leaf took up more space than was previously used by bargaining unit employees, and the True Leaf employees were receiving and driving forklifts that belonged to ACS employees. The cold room was in disarray, causing ACS employees extra time to retrieve items for shipment. The forty (40) carton count per pallet, used in the implemented rate, was not negotiated. The Union requested, but never received his request for information as to each individual worker's average hourly earning in December 2002 and

1  January and February 2003, and the same information for December 3003, January and
2  February 2004.

3      Mr. Jaquin, a twenty one (21) year employee of ACS, testified that when True Leaf
4  became a customer, it created several problems for the ACS employees. True Leaf added more
5  products to the cool room, it took ACS employees as much as twice as long to load pallets.
6  They, also, did not keep the cool room orderly, and often left broken or spilled pallets.

7      **The Union's position is as follows:**

8      1. True Leaf operation was an expansion of operations.

9      2. The introduction of cooling and loading True Leaf products drastically
10        impacted both the working conditions and the pay received as an alternative
11        incentive bonus.

12     3. Due to the extended length of time to load True Leaf products, the bargaining
13        unit suffered a tremendous loss of income.

14     4. The language in Article XV clearly states that the Alternative Incentive
15        Bonus is $0.1103 per carton manifested.

16     5. The Company's argument that the last paragraph of Article XV states that the
17        Company has the right to implement a different rate is flawed, because the
18        section shall take into account different functions as they relate to the total
19        time required.

20     6. The Company erroneously applied a "wrap lettuce" configuration of forty
21        (40) cartons per pallet and based thirteen (13) different rates based on this
22        rate.

23

24

25

6

# ANALYSIS

Set forth in this Analysis is a summary of undisputed facts and evidence regarding disputed facts sufficient to understand the parties' positions. Other facts and evidence may be noted in the analysis below to the extent that knowledge of either is necessary to understand the Arbitrator's decision. The facts of this case are hereinafter summarized. Where, however, relevant evidence regarding pertinent facts conflicts, the evidence is summarized.

Central to the resolution of any contract application dispute is a determination of the parties' intent as to specific contract provisions. In undertaking this analysis, and arbitrator will first examine the language used by the parties. If the language is ambiguous, or the parties do not agree on the intent, an arbitrator will assess comments made when the bargain was reached, assuming that there is evidence on the subject. While there is no language found in this Collective Bargaining Agreement to prohibit otherwise, it is not the intent of this Arbitrator to legislate any language in this Collective Bargaining Agreement, but to confine myself to the interpretation and application of the disputed Articles.

When Duda Cooling left ACS as a customer at end of the 2002-2003 season, the loss of the majority income producer to the Company created a domino effect for the Company and the employees. The opinion of this Arbitrator is that this incident was the major cause of the loss of income for the employees. Finding that the Company should be responsible for providing the employees a method for no loss of income from year to year is not reasonable. Market conditions, demand, availability of product, and availability of customers can, and has, changed beyond the control of the Company. The testimony of Mr. Smith, which was not refuted, was that True Leaf would not pay up to $15.40 per pallet, and would take his business to another firm. Therefore, he and True Leaf negotiated a rate per Article II, Section 3. It is held that it was the right of the Company per that Section to "…*temporarily set the wage scale*

1 *and working conditions...*", however, the notification process and subsequent negotiation with

2 the Union have to be further examined. This Arbitrator received no testimony during the

3 hearing, in the post-hearing briefs, or within the text of the Collective Bargaining Agreement

4 delineating the procedure for the notification. While the Company did post the new rates on the

5 plant bulletin board, it seems that a phone call or letter to the Union would have been more

6 appropriate. The negotiations of this rate between the Company and the Union were not

7 productive, and the decision of the parties to cease meeting after only two (2) sessions and refer

8 the matter to arbitration does not fit the true definition of negotiations, "discussing the matter

9 with a view of reaching agreement".

10 The testimony during the hearing brought to light the problems incurred with the mixed

11 pallets, and the cool room housekeeping while dealing with the True Leaf orders. The time

12 required to manifest an order needs to be addressed, but that is not the duty of an Arbitrator.

13 This problem should be addressed in productive meetings between the parties.

14 The application of "wrap lettuce configuration" of forty (40) cartons per pallet was, per

15 the testimony in the hearing, was the result of the Company's method of negotiating a similar-

16 to-existing net Alternative Incentive Bonus cost per pallet with True Leaf, then relying on

17 negotiations with the Union to set the actual rate.

18

19

20 **DECISION AND AWARD**

21 The essential role of the arbitrator is to interpret the collective bargaining agreement by

22 reviewing the evidence and testimony. Indeed, the validity of the award is dependent upon the

23 arbitrator drawing the essence of the award from the language and meaning of the collective

24 bargaining agreement. It is not for the arbitrator to fashion his own brand of industrial justice,

25 or to legislate changes which could affect the true intent of the parties when negotiating the

agreement. In interpreting the meaning of the collectively bargained language, this Arbitrator

draws the essence of the meaning of those articles and sections from the collective bargaining agreement between the parties.

Having heard or read and carefully reviewed the evidence and argumentative materials in this case and in light of the above Analysis,

**The decision is as follows:**

1. The Company correctly used Article I, Section 3 to set a temporary rate for True Leaf, as this was a new company.

2. The Company and the Union are directed to meet and negotiate the rate(s) and working conditions of True Leaf and bargaining unit employees, per Article I, Section 3, at their earliest opportunity.

3. Prior to negotiations for this rate, the Company shall accommodate the Union with requests for reasonable information pertaining to the above-referenced negotiations.

4. Per Article V, all fees and costs of the arbitration shall be divided equally between the parties.

5. Each party shall be responsible for their attorney fees, and other associated costs.

Dated this 11th day of November

Len Rutherford, Arbitrator

9